**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROBERT ARMSTRONG,

        *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

CIVIL ACTION NO. 2:17-cv-10731

DISTRICT JUDGE MARIANNE O. BATTANI

MAGISTRATE JUDGE PATRICIA T. MORRIS

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 17)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Armstrong is not disabled. Accordingly, **IT IS RECOMMENDED** that Armstrong's Motion for Summary Judgment, (Doc. 14), be **GRANTED**, the Commissioner's Motion, (Doc. 17), be **DENIED**, and this case be **REMANDED** under Sentence Four of 42 U.S.C. 405(g).

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Robert Armstrong's ("Armstrong") claim for Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.*, and Disability

1

Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 17).

On May 9, 2014, Armstrong filed an application for DIB alleging a disability onset date of April 29, 2014, and on May 20, 2014, he filed an application for SSI alleging the same onset date. (Tr. 192-98, 201-06). The Commissioner denied his claims. (Tr. 93-120). Armstrong then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on November 17, 2015 before ALJ Gabrielle R. Vitellio. (Tr. 38-92). The ALJ's written decision, issued February 12, 2016, found Armstrong not disabled. (Tr. 17-37). On January 10, 2017, the Appeals Council denied review, (Tr. 1-6), and Armstrong filed for judicial review of that final decision on March 7, 2017. (Doc. 1).

**B.     Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

3

> Step Three:   If the claimant is not performing substantial
> gainful activity, has a severe impairment that is expected to last
> for at least twelve months, and the severe impairment meets or
> equals one of the impairments listed in the regulations, the
> claimant is conclusively presumed to be disabled regardless of
> age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past
> relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her
> past relevant work, if other work exists in the national economy
> that plaintiff can perform, in view of his or her age, education,
> and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R.

4

404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Armstrong not disabled under the Act. (Tr. 20-33). At Step One, the ALJ found that Armstrong last met the insured status requirements of the Social Security Act on December 31, 2019, and had not engaged in substantial gainful activity in the interval between his alleged onset date of May 2, 2014 and his date last insured. (Tr. 22). At Step Two, the ALJ concluded that the following impairments qualified as severe: diabetes mellitus II, with peripheral neuropathy; mononeuritis not otherwise specified; sensory motor neuropathy; degenerative disc disease; generalized anxiety disorder; and depression. (Tr. 22-23). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 23-25). Thereafter, the ALJ found that Armstrong had the residual functional capacity ("RFC") to perform light work except

> no climbing of ladders, ropes and scaffolds:  and can engage in the remaining postural activities on a frequent basis with no pushing and pulling with the hands or wrists and with no use of the feet for foot controls. In addition, the claimant can perform simple routine tasks that require little or no judgment and skills that can be learned in no more than 30 days as stated in the Dictionary of Occupational Titles (DOT) at a specific vocational preparation (SVP) level of two, in environments without high production quotas, as needed on an assembly line; and in an environment without dangerous

5

machinery or unprotected elevations with only occasional interaction with co-workers and the public.

(Tr. 25). At Step Four, the ALJ found Armstrong incapable of performing his past relevant work. (Tr. 31). But proceeding to Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Armstrong can perform.

### E.   Administrative Record

#### 1.   Medical Evidence

The Court has reviewed Armstrong's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.   Application Reports and Administrative Hearing

##### i.   Function Report

On July 7, 2014, Armstrong filled out a Function Report that appears in the administrative record. (Tr. 262-69). He described his condition as "limit[ing] the ability to use my hands." (Tr. 262). Each day, "I mostly lay in bed or on the couch." (Tr. 263). "The pain keeps me awake most nights." (*Id.*). It also affected his ability to dress and bathe. (*Id.*). He "used to cook all the time," but since his onset date "[m]y hands can no longer grip cooking utensils." (Tr. 264). He could still do laundry and "light dusting" for an hour at a time each week, but he "need[ed] help folding laundry." (*Id.*). About three times a week he would venture outside, and continued to drive and shop in stores "[t]wice a month for about 2 hours," though he needed someone to accompany him. (Tr. 265-66). He could also

manage his own finances. (Tr. 265). Armstrong's hobbies and interests included listening to audiobooks and watching television, which he did every day. (Tr. 266).

Prompted to mark abilities with which he had difficulty, he marked: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and using his hands. (Tr. 267). "My hands, arms, legs and feet are in constant pain with numbness. These items aggregate the pain." (*Id.*). He could walk for about fifty yards before needing five minutes' rest. And though he followed written instructions "[f]ine," he could only "poorly" follow spoken instructions. (*Id.*).

### ii.      Armstrong's Testimony at the Administrative Hearing

Opening his testimony, Armstrong described what made him disabled: "Basically my hands became almost completely unusable. I have neuropathy in my hands, and I can't really do very much with my hands anymore, starting" on his alleged onset date. (Tr. 41). He couldn't "type or use a mouse for a computer. I can't do any kind of like housework anymore. Unable to cook because I can't feel with my hands. I can't cut things because I have a tendency of actually cutting my fingers. I can't feel properly. I've actually burned myself on the burner of my stove. I actually had my hand resting on the burner without realizing it until my girlfriend actually smelled my hand burning. And for the longest time actually I had rings on my hand from the burn." (Tr. 41-42). Other issues included "muscle spasms" in his hands "and throughout my body. So not only have I dropped things now but sometimes my hands will actually jerk so it's almost like I'm throwing things." (Tr. 42). An EMG taken in February 2015 revealed neuropathy in both hands and "carpal tunnel in

my right wrist." (Tr. 43). These problems plagued him daily. (Tr. 44). And as a result of his hand issues, he drove "only short distances." (Tr. 45).

In effect, any "sustained or repetitive" activity with the hands proved too difficult for him. (*Id.*). For several months, his physician had prescribed Lyrica but due to "memory issues . . . I usually don't even remember to take my medication in the A.M." (Tr. 47). He had also taken Gabapentin for a year, but "[i]t did not [help]." (*Id.*). His previous doctor had prescribed it and "he just wanted to keep increasing medications instead of finding what's causing issues." (Tr. 48). In the same time period, he had also been taking Meloxicam. (Tr. 48-49). Although his present treating physician referred him to a neurosurgeon, "he said he didn't want to do surgery on the carpal tunnel because with the neuropathy it really wouldn't do any good, I would still feel the same way." (Tr. 49).

Muscle spasms occurred in "[m]y feet, in my calves, my knees, my hands, my elbows, my eyes, my cheeks, my stomach, and my chest." (Tr. 50). Treating them involved treating his anxiety and depression, as well as his diabetes, blood pressure, and heart rate. (Tr. 51). "I will just be sitting or laying in a place and sometimes my feet, they'll just cramp up and release. And it's very, very painful." (Tr. 53). He also experienced neck pain, which he believed was caused by "deteriorating vertebrae." (Tr. 54). Although he sought physical therapy for a time, "I got sick so I wasn't able to finish the rest of my appointments after I went to some of them. And it didn't really help. There was a machine that they put on my back that sent electrical pulses into my back." (*Id.*). Clarifying, he explained that the exercises such therapy involved "were painful. But I was still able to do them, I just got really nauseated at the time. I'm not sure what was causing it. And I was vomiting a lot.

So I wasn't able to complete some of my appointments." (Tr. 55). In particular, he had difficulty stretching his legs and back. (Tr. 55-56).

Armstrong also noted that "life in general isn't very enjoyable." (Tr. 57). He suffered "really, really, really bad memory issues. And that really makes it hard for me to do anything at all. I can't even go into another room without forgetting what I went into that room for. And I—also it's hard for me to focus on things because I actually do hear voices in my head. So it's hard for me to determine what's reality and what's just in my head because I actually have to look at people's faces to see if they're actually speaking or not." (Tr. 59). This particular issue had dogged him since the age of 12. (*Id.*). Ultimately, he felt that treatment with medication had not been effective. (Tr. 65-66).

In past jobs, he had worked at Walden Books, receiving "packages from couriers and the postal service and deliver[ing] them to the corporate employees in Ann Arbor." (Tr. 60). He also worked at a gas station in Tennessee as a cook and then as a "customer service lead," at Best Buy in "the music and movie department," in "customer service for Sprint cell phones," as well as at "Asurion cell phone insurance company" where he "took phone calls and made insurance claims for them for lost, stolen, and damaged cell phones." (Tr. 61-62). He ultimately stopped working the latter job when his wrists began having difficulty, because "I couldn't do any typing. . . . And I also couldn't take the basically verbal abuse from the management of the company." (Tr. 63). Typically, he had no difficulty interacting with other people, but "I just do my best to not be noticed in life." (Tr. 64).

Due to his memory issues, Armstrong mentioned that "[m]y fiancé helps me with just about everything in life. . . . She reminds me to take my medicines during the day. If I am doing a task she'll remind me what steps I've already taken and what steps I still need to take in order to finish what I'm doing." (Tr. 67).

Several times per week, Armstrong visited the grocery store. The multiple visits were necessary because "it's hard for me to walk through the grocery store for very long because of the issues I have with my feet and knees. It's hard for me to push a cart because of my wrists and the pain I have in my shoulder and my hands. And really it's hard for me to be out in public for very long before I just need to go home." (Tr. 68-69). While at home, he turned on the television "just to have noise in the background to help me relax and to focus on something other than hearing voices in my head. It helps me cut through the sounds that I have in my mind." (Tr. 69). He did not follow the narratives. (*Id.*). When he drove, he only did so for about twenty minutes at a time because "[i]t's hard for me to sit for a very long period of time. It hurts my shoulder, it hurts my hand, my wrists, and my feet. The bottoms of them are numb so it's hard for me to tell whether I'm pushing the brake or the gas without looking down, which I really don't want to do while I'm driving." (*Id.*). He no longer cooked "because I can't stand in the same spot in front of the stove, I can't stir things because of my wrists and my hand. If I try to use seasoning sometimes . . . my hand will release and it will just drop into the food. I cut myself, I burn myself because I can't feel anything in my hands." (Tr. 70). Nor did he do yard work because "I can't walk behind a lawnmower, I can't push a lawnmower because of the vibration is really painful on my hands and my wrists. We have to hire somebody to do yard work." (*Id.*).

10

### iii.       The VE's Testimony at the Administrative Hearing

The VE began by classifying Armstrong's past work as an "assistant manager, fast food"—light, skilled work with an SVP of 6—a "customer service representative"—sedentary, semi-skilled work with an SVP of 4—a "[s]ales attendant"—light, unskilled work with an SVP of 2—a "[m]ail clerk"—light, unskilled work with an SVP of 2—a "short order cook"—light, semi-skilled work with an SVP of 3—and "cashier supervisor"—light, skilled work with an SVP of 7. (Tr. 76). Although he had not performed the jobs of assistant manager or cashier supervisor long enough to provide any transferable skills, "information giving skills" gathered from his time as a customer service representative would be "transferrable to other positions." (Tr. 77).

The ALJ then began to formulate hypotheticals. In the first, she described a person able to do "medium work" except "[n]o ladders, ropes, scaffolds, no dangerous machinery, no unprotected elevations. If I were to say that using one's hands on a frequent basis, not constant, but using both hands frequently. . . . I will add no pushing and pulling with the hands, as if pushing a lever or something where one would have to use the hands and wrists repeatedly. . . . I will have simple, routine tasks that require little or no judgment in environments with no high production quotas as needed on an assembly line. Now with that hypothetical, please take your time, I believe that leaves us with some of our jobs that have been performed, some of our jobs that do constitute past relevant work. Do you feel that the claimant would be able to do any of his past relevant work?" (Tr. 78). The VE replied that such a person could perform the jobs of sales attendant and mail clerk as described in the DOT, but not as performed. (*Id.*). Such a person could also perform other

11

medium unskilled work: "return checker positions"—with 16,000 national job availabilities at an SVP of 2—"packager positions"—with over 190,000 national job availabilities at an SVP of 2—and "stueber positions"—with over 35,000 national job availabilities at an SVP of 2. (Tr. 80). Adding a limitation of "no pushing and pulling with the feet," the VE added, would not alter the number of positions available. (*Id.*).

In the ALJ's second hypothetical, she posed a person able to do "[l]ight work," except "no climbing ladders, ropes, scaffolds, no dangerous machinery, no unprotected elevations. I'm going to say using the hands on a frequent basis. And I'm going to say again, the no pushing or pulling with the hands and wrists." (Tr. 81). The ALJ then added, "And forgive me, the SVP 2 as I described it earlier, as well." (*Id.*). The VE provided several jobs in the national economy such a person could perform: "photocopy machine operator positions"—with 70,000 national job availabilities—"buckle inspector"—with over 80,000 national job availabilities—and "sorter positions"—with over 60,000 national job availabilities. (Tr. 81-82). Again, adding the limitation of no pushing or pulling with the feet would not reduce these numbers. (Tr. 82).

In the third hypothetical, the ALJ imagined an individual capable of sedentary work with an SVP of 2 "as I described before, including the no high production quotas as needed on an assembly line. And again, I'm going to say no pushing or pulling with the wrists and hands." (*Id.*). The VE furnished the following numbers: "surveillance system monitor positions"—with over 15,000 national job availabilities—"document addresser positions"—with over 25,000 national job availabilities—and "conveyor table worker"—with 20,000 national job availabilities. (Tr. 83). None of the jobs required pushing or

12

pulling with the feet. (*Id.*). Adding the limitation of "occasional interaction" with coworkers and/or the public, however, would eliminate the surveillance system monitor positions. Nevertheless, "inspector positions"—with over 30,000 national job availabilities—would remain.

The ALJ then asked specifically about the "handling, gripping" and other "fine manipulation" requirements of the latter four positions. (Tr. 83-84). The VE indicated that surveillance system monitor would require "less than occasional" reaching, handling, and fingering. (Tr. 84). Table worker, inspector, and document addresser would all require "frequent" reaching, handling, and fingering. (*Id.*).

The ALJ then asked if she was correct that the VE's testimony "regarding the definition of the occasional interaction, breaks, and absenteeism is based on your experience," and the VE replied that his testimony as to breaks and absenteeism was based on experience, while his testimony as to occasional interaction was based on "the Revised Handbook for Analyzing Jobs, which is a supplement to the DOT." (Tr. 87).

### F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an

13

impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable"
and non-acceptable sources provide evidence to the Commissioner, often in the form of
opinions "about the nature and severity of an individual's impairment(s), including
symptoms, diagnosis and prognosis, what the individual can still do despite the
impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical
sources" issue such opinions, the regulations deem the statements to be "medical opinions"
subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from
the definition of "medical opinions" are various decisions reserved to the Commissioner,
such as whether the claimant meets the statutory definition of disability and how to measure
his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of
medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at
whether the source examined the claimant, "the length of the treatment relationship and the
frequency of examination, the nature and extent of the treatment relationship,
supportability of the opinion, consistency of the opinion with the record as a whole, and
specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544
(6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to
"other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir.
2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if
they are "well-supported by medically acceptable clinical and laboratory diagnostic
techniques" and are "not inconsistent with the other substantial evidence in [the] case

14

record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

15

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish

the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.

1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Armstrong puts forth two arguments in his brief: (1) the ALJ included multiple restrictions not posed to the VE in his RFC analysis, depriving his Step Five findings of support from substantial evidence, (Doc. 14 at ID 579-81); and (2) the ALJ failed to provide "good reasons" for discounting the opinion of Dr. Ageloff-Kupetz, his treating physician, (Doc. 14 at ID 582-84). I consider each argument in turn.

### 1.    Unaccounted-For Limitations

In his first argument, Armstrong highlights four limitations present in the RFC that he supposes "were not posed" to the VE at the hearing: "Can only engage in remaining postural activities on a frequent basis"; "Can only perform simple routine repetitive tasks"; "Can only perform tasks that require little or no judgment"; and "Can only work in environments without high production quotas (such as an assembly line would require)." (Doc. 14 at ID 579). "Defendant cannot sustain [its] burden when it has failed to provide the VE with all of plaintiff's limitations." (Doc. 14 at ID 580). Moreover, in his estimation, the RFC's limitations to "simple routine tasks" and "little or no judgment" are incompatible with any jobs identified at Step Five of the ALJ's analysis per their description in the DOT. (Doc. 14 at ID 581) ("In this case, the ALJ issued a decision with an RFC that . . . conflicted with the D.O.T.").

As an initial matter, the ALJ included the latter three of the four 'unaccounted-for' limitations in her questions to the VE. They appeared explicitly in her first hypothetical

18

question, and then were incorporated by reference into her second and third hypotheticals. *Compare* (Tr. 78) (first hypothetical: "Oh, let me pose the skill level. I will have simple, routine tasks that require little or no judgment in environments with no high production quotas as needed on an assembly line."), *with* (Tr. 81) (second hypothetical: "And forgive me, the SVP 2 as I described it earlier, as well."), *and* (Tr. 82) (third hypothetical: "SVP 2 as I described before, including the no high production quotas as needed on an assembly line."). Thus, Armstrong cannot say with accuracy that the ALJ failed to pose those limitations to the VE in the appropriate hypotheticals. Nor can he impeach the VE's answers—adopted via the ALJ's Step Five finding—with descriptions in the DOT. *See Matelski v. Comm'r of Soc. Sec.*, 149 F.3d 1183, at *6 (6th Cir. June 25, 1998) (unpublished table decision) ("A vocational expert's testimony may override the job descriptions and requirements contained in the DOT; Matelski therefore cannot use the DOT to rebut or impeach the vocational expert's testimony.").

The ALJ did not, however, pose the RFC limitation "can engage in the remaining postural activities on a frequent basis" to the VE at any point. (Tr. 25). The relevant question, therefore, is whether this error was harmful. Because the resultant RFC was more favorable physically than the hypotheticals presented the VE, the ALJ's failure to include the additional postural restriction was not harmless error. *Accord, e.g.*, *Nevils v. Colvin*, No. 3:12-0188, 2016 WL 7014063, at *8 (M.D. Tenn. Dec. 1, 2016), *report and recommendation adopted sub nom. Nevils v. Soc. Sec. Admin.*, No. 3:12-CV-00188, 2017 WL 119542 (M.D. Tenn. Jan. 12, 2017) ("In the case at bar, the ALJ's posed hypothetical was less favorable physically due to its exclusion of the 'walking at will' option. The Court

thus concludes that this omission was not harmless error."); *Haller v. Comm'r of Soc. Sec.*, No. 09-CV-13582, 2010 WL 5562274, at *9 (E.D. Mich. Aug. 9, 2010), *report and recommendation adopted sub nom. Haller v. Astrue*, No. 09-13582, 2011 WL 87250 (E.D. Mich. Jan. 11, 2011) (reaching the same conclusion for the same reason); *cf. Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 845 (6th Cir. 2005) (upholding the Commissioner's determination where the *hypothetical given the VE* was more favorable than the RFC). Remand is required on this ground.

## 2.    Treating Physicians

Armstrong's second argument for remand focuses on the ALJ's treatment of Dr. Ageloff-Kupetz's opinion. The ALJ discounted the opinion because:

> There are no progress notes or objective findings that support this degree of limitation regarding postural movement or this degree of severity regarding manipulative abilities. There is absolutely no clinical objective evidence to support that claimant would have to elevate [his legs] above his heart for four hours a day. There is no medically diagnosed impairment on the record that would be consistent with this recommendation.

(Tr. 29). On appeal, Armstrong concedes that no diagnosis or impairment of record would require the leg-elevation restriction, but asserts—without accompanying citation to authority—that this defect "is only a valid reason to discredit that restriction. An ALJ cannot dismiss an otherwise valid report in its entirety because there is one restriction she disagrees with." (Doc. 14 at ID 582).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's

opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating source's opinion.*" *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

In the instant case, the reasons given for discrediting Dr. Ageloff-Kupetz's opinion in the ALJ's decision satisfy this standard. The lack of support for the leg-elevation limitation is not, as Armstrong hopes, "only a valid reason to discredit that restriction, (Doc. 14 at ID 582)—in fact, it may permissibly be (and ostensibly *was*) interpreted as evidencing the opinion's general lack of supportability, internal consistency, and consistency with other record evidence. *Cf. Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 245 (6th Cir. 2016) (upholding an ALJ's decision to discount a treating-source opinion because her "citation to the EMG, which did not support [her] referenced [neuropathy] diagnosis, indicates that her medical opinion—*at least* insofar as it concerns neuropathy—

21

is not supported by clinical diagnostic techniques." (emphasis added)). And in any case, the ALJ also observed that the record did not support the postural or manipulative limitations specified in Dr. Ageloff-Kupetz's opinion. (Tr. 29). Substantial evidence underlies these findings, and received discussion earlier in the ALJ's opinion. (Tr. 25-29); *e.g.*, (Tr. 350, 355, 357-60, 383-84, 390-91, 405) (mild objective findings); (Tr. 320, 336, 346, 382, 388-89, 405, 416) (normal or unimpaired gait); (Tr. 346, 464, 483, 480) (normal musculoskeletal examinations); (Tr. 336, 338, 389) (normal manipulative strength); (Tr. 432) (Armstrong's depression kept him from playing guitar); (Tr. 390) (author "unclear" on whether Armstrong was exerting "maximum effort" in his examination); (Tr. 336) (only mild difficulty with balance, dexterity, and squatting or rising). Taken together, these reasons followed a comprehensive discussion of the opinion and review of the evidence, and thus are "good" within the meaning of the pertinent regulations. *See, e.g.*, *Dickey-Williams v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 792, 804 (E.D. Mich. 2013) ("[T]his is not a case in which the Court could not determine, under the principles of 'meaningful [appellate] review of the ALJ's decision[]' . . . what evidence the ALJ relied on to substantiate her conclusion of less than controlling weight. And this is not a case in which the ALJ failed to consider at all a treating source, or discredit a treating source entirely. . . . The ALJ thoroughly examined Dr. Clague's opinion. And the substantial evidence the ALJ relied on not only existed . . . but was discussed at length in the ALJ's decision" (internal citations omitted)).

Accordingly, the ALJ's decision to discount Dr. Ageloff-Kupetz's opinion is supported by substantial evidence.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Armstrong's Motion for Summary Judgment, (Doc. 14), be **GRANTED**, the Commissioner's Motion, (Doc. 17), be **DENIED**, and this case be **REMANDED** under Sentence Four of 42 U.S.C. 405(g).

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ.

P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 11, 2017                              S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 11, 2017                          By s/Kristen Castaneda
                                                Case Manager

24